UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,                      Case No. 2:20-CR-20599

v.                                    Hon. Matthew F. Leitman

D-1  JOHN ANGELO,
D-5  GLENN FRANKLIN,
D-7  THOMAS QUARTZ,

          Defendants.
_____/

## DEFENDANTS' JOINT MOTION IN LIMINE TO PRECLUDE GOVERNMENT FROM ELICITING LAY OPINION TESTIMONY REGARDING KNOWLEDGE OF THE ALLEGED FRAUD

Defendants, by and through their respective undersigned counsel, respectfully move this Court to preclude lay opinion testimony regarding knowledge of the alleged fraud, pursuant to Federal Rules of Evidence 602, 701, and/or 403 for the reasons stated in the brief that follows.

1

Dated: October 9, 2023

/s/ Abed Hammoud
Abed Hammoud (P54908)
*Counsel for John Angelo*
645 Griswold, Ste. 1717
Detroit, MI 48226
(313) 303-0427
abed@abedhammoudlaw.com

/s/ John Minock
John Minock  (P24626)
*Counsel for Thomas Quartz*
339 E. Liberty, Suite 200
Ann Arbor, MI  48104
734-668-2200
jminock@cramerminock.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                    Case No. 2:20-CR-20599

v.                                   Hon. Matthew F. Leitman

D-1  JOHN ANGELO,
D-5  GLENN FRANKLIN,
D-7  THOMAS QUARTZ,

        Defendants.
_____/

## DEFENDANTS' BRIEF IN SUPPORT OF JOINT MOTION IN LIMINE TO PRECLUDE GOVERNMENT FROM ELICITING LAY OPINION TESTIMONY REGARDING KNOWLEDGE OF THE ALLEGED FRAUD

**ISSUE PRESENTED**

    I.    Should the Government be precluded from eliciting lay opinion testimony regarding knowledge of the alleged fraud?

        a.  Defendants answer "Yes."

        b.  The United States answers "No."

i

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

### Court Rules

Fed. R. Evid. 403

Fed. R. Evid. 602

Fed. R. Evid. 701

### Case Law

*Direct Sales Co. v. United States*, 319 U.S. 703 (1943)

*Ruan v United States*, 597 U.S. ___, 142 S. Ct. 2370 (2022)

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023)

*United States v. Gyamfi*, 805 F.3d 668 (6th Cir. 2015)

*United States v. Howell*, 17 F.4th 673 (6th Cir. 2021)

*United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2007)

*United States v. Kilpatrick*, 798 F.3d 365 (6th Cir. 2015)

*United States v. Barnes*, 383 F.2d 287 (6th Cir. 1967)

*United States v. Hardy*, 643 F.3d 143, 152-53 (6th Cir. 2011)

*Old Chief v. United States*, 519 U.S. 172, 180 (1997)

*United States v. Kessi*, 868 F.2d 1097 (9th Cir. 1989)

## INTRODUCTION

At a court hearing on June 12, 2023, the Government realized it had another serious problem with this case—it lacked evidence any of the defendants knew about the fraudulent scheme they allegedly conspired to commit. Subsequently, the Government provided discovery suggesting certain of its cooperating witnesses now claimed to have opinions concerning about the defendants' knowledge of the method by which police reports were obtained by strangers.

At the *Enright* hearing on September 18, 2023, the Government presented its three "best witnesses"[1] as to that issue. The Court concluded that none of the three "best witnesses" had knowledge of the alleged fraud, nor could they properly impute such knowledge to any defendant. The Government then moved to dismiss the charges in Count One against Mann, Sitto, and Daneshvar.  (Gov. Mot., ECF No. 485)

The remaining defendants move this Court to preclude lay opinion testimony from these or any other government witnesses regarding knowledge of the fraud as alleged in Count One of the Third Superseding Indictment ("Indictment").

---

[1] In the Government's own words.  *See* ECF No. 478 at PgID.9859.

1

## BACKGROUND

The "fraud" alleged and charged in Count One of the Indictment is that Karen Miller ("Miller") used the DPD username and password of Carol Almeranti ("Almeranti") to login to LexisNexis's databases falsely representing to LexisNexis that she was Almeranti in order to send crash reports to Robert and Jayson Rosett. *See* Indictment, ECF No. 441 at PgID.9111. This alleged fraud has been reiterated countless times by the Government. *See* ECF No. 481 at PgID.9905-07 (Def. Br. Regarding *Enright* Hr'g., which provides a sampling of statements by the Government during the course of the case).[2]

On April 26, 2023, the Government filed its sealed proffer (ECF No. 334) describing the alleged wire-fraud conspiracy. The defense's sealed response (ECF No. 361) noted that the Government failed to provide "any evidence that any defendant had the requisite knowledge that crash reports were being obtained by means of fraud." *Id*. at page 2. On June 12, 2023, the Court addressed that argument (*see* Motion Transcripts, ECF No. 378 at PgID.6663-77). At one point, the Court asked Government Counsel, "Can you recount for me the strongest piece of witness testimony where some human being, whether convicted of a felony or not, told you that any one of these defendants was aware that the reports were

---

[2]     Defendants do not concede that Miller's use of Almeranti's username and password is legally or factually sufficient to constitute a misrepresentation for purposes of federal criminal fraud.

being obtained through fraud?" *Id*. at PgID.6671.  Counsel for the Government

responded, "Anthony Sereno says that. . . Why don't I submit the 302 to you and

I'll highlight the portion that I'm recalling." *Id*.

The Court concluded its on-the-record discussion with Government counsel

on this topic by asking "if it occurs to you that the evidence actually does not

show, with respect to any particular defendant, that that defendant knew that the

reports were being obtained by fraud, from your perspective as a prosecutor, would

you think that the right move for you would be to dismiss the charge?" *Id*. at

PgID.6677.  Government counsel responded, "Yes." *Id*.

Defendants have been unable to locate any Sereno FBI 302 report containing

the Government's strongest piece of evidence in which Sereno told the

Government, prior to the Indictment, that any of the remaining defendants was

purportedly aware that reports were being obtained by means of the alleged fraud.

Sereno's sworn testimony on January 15, 2020 (eleven months prior to the original

Indictment in this case) was clear that he did not know the source of the crash

reports.  The transcript of this testimony (**Exhibit A**) does not include a single

reference to "fraud" as alleged by the Government even when specifically asked

about the mechanics of how the reports were obtained, or even whether they were first retrieved by a Detroit police officer (**Exhibit A**, pages 28–30).[3]

However, on June 19, 2023, one week after the Court granted the *Enright* hearing, the Government met with Sereno pursuant to his cooperation agreement and subsequently produced an FBI 302 report containing a new conclusory statement that "JOHN, CORY MANN (MANN), BRENT SITTO (SITTO), GLEN FRANKLIN (FRANKLIN), and MICHAEL DANESHVAR (DANESHVAR) all knew the fresh reports were illegal and obtained fraudulently." (**Exhibit B**, FBI 302, Sereno interview at page 2.)

In addition to meeting with Sereno, the Government met with three other cooperating witnesses in the ten days following the June 12, 2023 hearing—Mathew Schwartz, Tracy Varjabedian, and David Katz. It is clear from the latest FBI 302s summarizing the interviews with these witnesses that the Government was suggesting new ways to testify. These 302s share similar verbiage, which is also found in Sereno's 302 attached as **Exhibit B**. They are attached herein as **Exhibits E** (Schwartz 302), **F** (Varjabedian 302), and **G** (Katz 302). For example, the Sereno report (**Exhibit B**) included the words "insider", "insiders", and "insider's" eleven times. The Varjabedian report (**Exhibit F**) also included the

---

[3]  Exhibit A is not being filed electronically as an exhibit. However, it will be submitted to the Court as part of the required courtesy copy package.

word "insider" so did the Katz report (**Exhibit G**).  This consistent use of the word "insider" across reports is telling, especially since undersigned defense counsel cannot find such references in previous reports or discovery material from the 10-year, FBI investigation that began in 2013.  In contrast, these interviews were conducted within a period of six days and government witnesses started using the same word as if all had contracted the same illness (perhaps they caught it from the government).

The reports were also noticeably similar—"the insider must have misrepresented," **Exhibit B**; "[t]he source had to misuse their access," **Exhibit E**; "[t]he only way to get watermark (sic) police reports," **Exhibit F**; "[t]here had to be an insider," **Exhibit G**.  In addition to these general observations, defendants will address below the reports from each specific Government witness as well as the testimony from the witnesses who testified at the *Enright* hearing.

### 1. **Anthony Sereno ("Sereno")**

On January 15, 2020, Sereno gave testimony before a grand jury.  Sereno was asked, "Do you know who was sending the emails?"  He replied, "I do not." (**Exhibit A**, pp. 28–29.)  Sereno testified that he tried to find out where the reports were coming from but Mathew Schwartz "would say that he just had this – somebody that would send them."  *Id.*, at 29.  Schwartz did not tell him.  *Id*. Although Schwartz knew Jayson Rosett, Schwartz did not know the source of the

crash reports.[4]  Sereno also did not know that it was Detroit Police Department

officers.  *Id*.  This was more than one month prior to Sereno pleading guilty to two

felonies not involving wire fraud.

One week after the June 12, 2023 hearing, Sereno met with the Government

as a part of his cooperation agreement.  The FBI 302 (**Exhibit B**) following the

meeting stated (emphasis added):

> If the report had a watermark and was emailed, that report could
> only be accessed by an insider. Insiders needed to show a
> legitimate insider purpose in order to obtain a report. The
> emailed fresh reports with watermarks sent to SERENO and the
> others were not covered under an insider's authorized purpose.
> Thus, when the insider accessed the reports for the purpose
> outside their official authorized use, the insider must have
> misrepresented the purpose of obtaining the report. **SERENO
> agreed this misrepresentation was fraud**. **SERENO** and the
> others involved in the group **knew only insiders, who obtained
> reports fraudulently, could provide them** with 15-20 fresh
> reports with watermarks daily.
>
> *        *        *
>
> The police reports were coming from a source or an insider with
> access to a bulk number of fresh police reports. An insider word

---

[4]  On September 26, 2018, Schwartz, during a proffer session, was asked by the
Government whether Jayson Rosett ever talked about "who he was getting them
from or where?"  Schwartz stated, "Never, never did he say that."  He was then
asked "he never went into what that relationship was or anything of that nature?"
Schwartz replied, "Never went into that relationship."  **Exhibit C** (transcripts
excerpts of Schwartz's proffer).  On November 13, 2018, Schwartz was
interviewed again by the Government, and the report from that interview indicates
that "Schwartz stated he did not know police officers were involved in getting
Rosett the police crash reports."  **Exhibit D**, MOI Schwartz 11-13-18, at ¶ 35.

by (sic) someone in law enforcement or someone with access who used the reports for official business.

2. **Mathew Schwartz ("Schwartz")**

Schwartz pled guilty two non-wire fraud offenses on October 15, 2020. Prior to his "cooperation" with the Government, Schwartz denied knowledge regarding the source of the crash reports. *See* **Exhibit C** and **Exhibit D** (¶ 35).

On June 22, 2023, Schwartz met with the Government. The substantive part of the FBI 302 summarizing that interview consists of two sentences—"Jayson Rosett (ROSETT) told SCHWARTZ the source of the illegal police reports was someone who worked in the '**Detroit Fire IT' Department**. The source had to misuse their access to obtain the police reports." **Exhibit E** (emphasis added).

Schwartz was not called to testify at the *Enright* hearing. Most likely, the Government did not view him as one of the three "best witnesses" as to the knowledge of the alleged fraud since he did not go far enough and he referred to the Detroit Fire Department as opposed to the Police Department.

3. **Tracy Varjabedian ("Varjabedian")**

Varjabedian is Sereno's girlfriend and his cooperation agreement has a vicarious cooperation provision that benefits her.

On June 20, 2023, Varjabedian met with the Government. The FBI 302 of her interview states, "The police reports from JOHN ANGELO were illegal and

fraudulently obtained by someone with insider access to the reports." **Exhibit F**, at

3.  The report also stated, "The person who initially obtained the police reports

from the police or Lexis, obtained them by misrepresenting the use of their

credentials.  This person then sold the police reports for their own gain or to make

money." *Id.*

### 4.  **David Katz ("Katz")**

Katz pled guilty to structuring a financial transaction on June 12, 2018.

On June 14, 2023, Katz met with the Government without his lawyer

present.  The FBI 302 report of that meeting stated, "KATZ, ZACK, and MANN

believed somebody knew somebody else at DPD and procured reports through the

DPD contact before the reports were available to the public." **Exhibit G**, at 1.

"KATZ determined that misrepresentations **had to be made** by the person initially

accessing and providing the DPD reports." *Id.*, at 1-2 (emphasis added).  "There

**had to be** an insider . . ." *Id.*, at 2 (emphasis added).

At the *Enright* hearing, Katz was asked if he knew how the crash reports

were being obtained and his response was "I don't know."  ECF No. 478 at

PgID.9849-50.

### 5.  **Aaron Korson ("Korson")**

Korson was a paid informant for the FBI.

At the *Enright* hearing, Korson was asked "[w]as there any discussion about how this insider at DPD was getting access to the database," to which he responded "[t]hat they were inside of the records department." *Id*. at PgID.9742.  A follow-up question was asked, "Anything more than that?" to which he responded, "No." *Id*.  A few minutes later, Korson was asked a similar question if there was "any discussion about how the reports were being extracted from the database," to which he responded that "[t]he only discussion was that they were only getting sent directly to John, through e-mail." *Id*. at PgID.9746.  When asked if that was it, Korson confirmed, "That was it." *Id*.  When asked about people inside the records department of the DPD, Korson responded, "I don't know.  I don't work for Detroit Police Department." *Id*. at PgID.9728.  He also was asked the name of the source of the crash reports and he never knew the person's name. *Id*.

The Court concluded that Korson's testimony did "not show that any defendant was aware that the reports were being obtained by fraud."  ECF No. 484 at PgID.9932.

## 6. **John Capella ("Capella")**

At the *Enright* hearing, Capella stated that he has never spoken to or met with anyone on the "inside" of the Detroit Police Department. *Id*. at PgID.9779. When asked if he ever heard of an individual named Carol Almeranti, he responded, "That sounds familiar. I don't want to say I haven't heard.  I don't know

her." *Id*. at PgID.9811.  He has never spoken to Karen Miller.  *Id*. at PgID.9791.

Capella testified that he knew Miller's name when he was first calling on crash

reports given to him by a Dr. Poeces.  However, Capella stated, "after that, I can't

say with certainty, 100 percent sure, if they were still coming from her."  *Id*. at

PgID.9816.  When asked, "Is it a fair characterization that you understand that she

was a link in the e-mail chain, but you don't know if she was the actual person

getting those reports," *Id*. at PgID.9816-17, he responded, "That's correct,

especially since she said she was going to have somebody else do it, so it could

have been whoever that person was."  *Id*. at PgID.9817.  Capella never had any

agreement with anyone that Miller would be used to get the crash reports.  *Id*.

Capella also did not know the "mechanism" in which the login was

achieved.  *Id*. at PgID.9830-31.  The following testimony was elicited:

> Q. You don't need to do be a computer hacker. I'm asking you if
> you have any personal knowledge of how Karen Miller came into
> the possession of either the reports prior to Poces or the reports
> subsequent, where you said, here she goes again. You don't
> know, do you?
>
> A. As a matter of fact, no.

*Id*. at PgID.9831.

Capella admitted he had no personal knowledge of how Miller came into

possession of the reports.  Capella assumed "you had to be in the police system to

get them all," but then confirmed that it was just an assumption on his part that he

did not know for a fact.  *Id*. at PgID.9832.  He later testified that "I just presumed that it didn't come from LexisNexis, because you can't do that anymore, on that site, it had to come from some official government website."  *Id*. at PgID.9834.

Capella's testimony contradicts the Government's theory that a false representation was made to LexisNexis as Capella assumed the reports were not from LexisNexis, but rather "some" unidentified government website.  Later in his testimony, Capella admitted he was "guessing" that the reports "were downloaded off of the police department – their website."  *Id*. at PgID.9838-39.  In general, Capella agreed there were "a lot of assumptions and presumptions" on his part.  *Id*. There was no testimony from Capella that he had knowledge that Miller allegedly made a false representation to LexisNexis by using Almeranti's login information. There was no testimony from Capella regarding Almeranti's login information.

The Court concluded that "it seems pretty clear from Mr. Capella's testimony, that he, personally, did not know that the reports were being obtained by the fraud alleged in the indictment."  ECF No. 484 at PgID.9934.  The Court further explained as follows:

> Mr. Capella revealed that he did not even understand that the reports in question were coming from LexisNexis or that Almeranti and Miller were making false statements. On two occasions during his testimony, he suggested that he believed or assumed that the reports in question were coming from the DPD's website, not LexisNexis' website.

*Id*.  Regarding the Defendants' knowledge of the "fraud," the Court further stated:

11

> Given that Mr. Capella was not personally aware that the reports were obtained from LexisNexis by false pretenses, his repeated testimony that he discussed fraud with the other defendants, to me, is not entitled to much, if any, weight. Whatever he meant by his discussions with the other defendants concerning fraud, in my view, given his own testimony, couldn't have meant that the fraud that lies at the heart of the agreement alleged by the government, because his testimony suggests to me that he wasn't aware of that alleged fraud.

*Id*. at PgID.9935.  *See also Id*. at PgID.9945, ln 7-11.  The Court's observation is equally applicable to each of the witnesses discussed above.

## LAW AND ANALYSIS

**A.      The lay opinion testimony of the Government's witnesses fails to satisfy the requirements of Fed. R. Evid. 602 and 701.**

"A fundamental rule of evidence is that '[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.' Fed. R. Evid.  602."  *United States v. Howell*, 17 F.4th 673, 682 (6th Cir. 2021).

> In conjunction with that principle, Rule 701 states that when a witness is not testifying as an expert under Rule 702, testimony in the form of an opinion is limited in that it must be: (1) rationally based on the witness's perception; (2) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

*Id*. at 682-683 (internal quotations omitted) (citing Fed. R. Evid. 701).. "The party offering the testimony under Rule 701 must establish that all three requirements are satisfied." *United States v. Gyamfi*, 805 F.3d 668, 672 (6th Cir. 2015).

"The function of lay opinion testimony is to 'describ[e] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" *Howell*, 17 F.4th at 684 (quoting *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015)). "When a witness has not identified the objective bases for [their] opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find." *Howell*, 17 F.4th at 684 (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992)).

The Government has not met its burden to show either of the first two requirements of Rule 701 have been satisfied.

1. **Rationally based on the witness's perception.** "[T]he rational-basis requirement 'is the familiar requirement of first-hand knowledge or observation.'" *United States v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007) (quoting Fed. R. Evid. 701 advisory committee's note on 1972 Proposed Rules). "Rule

13

701(a) requires that lay opinion testimony be *both* (a) based on the witness's first-hand perceptions *and* (b) rationally derived from those first-hand perceptions." *Id.* at 119.

> [L]ay opinion testimony regarding a defendant's knowledge will, in most cases, only satisfy the rationally-based requirement if the witness has personal knowledge of one or more 'objective factual bases from which it is possible to infer with some confidence that a person knows a given fact . . . includ[ing] what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were.

*Id.* (quoting *Rea*, 958 F.2d at 1216) (emphasis added).  One of the purposes of Rule 701 is to avoid "spoon-feeding the jury the government's theory by using hearsay or otherwise unreliable conclusory statements." *Gyamfi*, 805 F.3d at 672.

Here, all of the six Government witnesses identified above lacked personal knowledge regarding Miller's use of Almeranti's password.  None of these witnesses had any first-hand dealings with Karen Miller.  Sereno has previously given sworn testimony that he did not know the source of the crash reports.  *See* **Exhibit A**, at 28–29.  Similarly, prior to Schwartz's cooperation he never claimed to know the source of the crash reports.  *See* **Exhibit C** and **Exhibit D** (¶ 35). Even the FBI 302 from his most recent meeting with the Government after the June 12, 2023 hearing does not correctly identify the source.  **Exhibit E**.

These witnesses do not have any firsthand experience with the source.  Yet, the recent reports the government provided suggests these witnesses seem willing to express an opinions about police reports without any foundation to do so.  It is reasonable to conclude that the Government fed Sereno a version of the "fraud" as the FBI 302 summarizes the Government's narrative and then states "SERENO agreed this misrepresentation was fraud."  But at the time he was actually involved in the alleged conspiracy, Sereno did not know the "insider," let alone there even was an "insider" and never even used that term over multiple interview sessions.  Thus, how could Sereno rationally know, based on his own perceptions, what the "insider" represented and to whom?  Sereno was never a member of the Detroit Police Department or an employee of LexisNexis, and thus lacked personal knowledge of their internal procedures.  While he can certainly speculate and assume, he cannot rationally derive an opinion because he lacks personal knowledge.  There is thus no objective basis for Sereno to opinethat crash reports were obtained by means alleged in the indictment.  Sereno should be so instructed prior to taking the witness stand.

Regarding the other witnesses, the FBI 302 generated following the Schwartz meeting of June 22, 2023 stated that "The source had to misuse their access to obtain the police reports."  **Exhibit E**.  The FBI 302 regarding the Varjabedian meeting stated that "The person who initially obtained the police

15

reports from the police or Lexis, obtained them by misrepresenting the use of their credentials." **Exhibit F**, at 3.  The FBI 302 regarding the Katz meeting stated that "KATZ, ZACK, and MANN believed somebody knew somebody else at DPD" and "that misrepresentations had to be made by the person initially accessing and providing the DPD reports." **Exhibit G**, at 1-2.  The Katz 302 also goes on to state "There had to be an insider . . ." **Exhibit G**, at 2.

Schwartz, Varjabedian, and Katz have no personal knowledge of this matter. The FBI 302s reflect speculation and potential opinion testimony concerning (i) what defendants "believed," (ii) what "misrepresentations *had to* be made" to obtain police reports, or (iii) that there "*had to* be an insider" to obtain police reports.

For all of the reasons stated above, the identified witnesses should be precluded from testifying that (i) police reports were obtained by the method alleged in the indictment, or (ii) any defendant knew crash reports were obtained by such method.  .  *See Kaplan*, 490 F.3d at 119 ("Because the Government did not lay an adequate foundation, [witness]'s testimony expressing his opinion as to Kaplan's knowledge [of the fraud] was not admissible").

2. **Helpful opinion testimony.**  "It is not 'helpful' when a witness, lay or expert, forms conclusions for a jury that the jurors are competent to reach on their own." *Kilpatrick*, 798 F.3d at 380.  "Nor is it helpful for a lay opinion witness to

speculate." *Id*. Furthermore, "a lay witness may not explain to a jury what inferences to draw . . . because this crosses the line from evidence to argument." *Howell*, 17 F.4th at 685 (quoting *Kilpatrick*, 798 F.3d at 381).

For the sake of argument, even if opinion testimony from the Government's witnesses were rationally based on their first-hand perceptions (which it is not), it is not helpful for them to explain or suggest to the jury what inferences to draw as this crosses the line from evidence to argument. Furthermore, testimony from Sereno that he agrees the Government's narrative shows "fraud" is a legal conclusion and it is unhelpful because jurors can make their own determination on that legal question.

The 302s show how the witnesses are merely speculating and making conclusory assertions aimed to tell the jury what inferences to draw. This is improper. The 302 regarding the Schwartz meeting stated that "The source had to misuse their access to obtain the police reports." **Exhibit E**. That is speculation and it improperly tells the jury to infer that a "source" that he did not even know, or knew anything about, misused their access. The FBI 302 regarding the Varjabedian meeting stated that "The person who initially obtained the police reports from the police or Lexis, obtained them by misrepresenting the use of their credentials." **Exhibit F**, at 3.

This is more speculation.

17

**B.      The probative value, if any, of the lay opinion testimony of the Government's witnesses is also substantially outweighed by the dangers set forth in Fed. R. Evid. 403, warranting exclusion of such evidence.**

Even if, for the sake of argument, the lay testimony of the Government's witnesses met the requirements of Rules 602 and 701, any probative value would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and/or misleading the jury, and should be excluded pursuant to Fed. R. Evid. 403.

The Court must balance the probative value and need for the evidence against the harm likely to result from its admission. *See United States v. Hardy*, 643 F.3d 143, 152-53 (6th Cir. 2011). Unfair prejudice "means an undue tendency to suggest decision on an improper basis." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). In this case, testimony or evidence imputing these witnesses' newly acquired knowledge of the methods for obtaining police reports alleged in the Indictment fraud to the defendants would be unfairly prejudicial, would confuse the issues, and would mislead the jury.

In *Kaplan*, medical providers "hired 'runners' to recruit patients by staging automobile accidents and identifying individuals who had been in legitimate accidents but were willing to exaggerate their injuries," and then referred the patients "to a cooperating law office." *Kaplan*, 490 F.3d at 114. The Second Circuit vacated the fraud convictions of attorney Kaplan "because the district court erred in admitting, without adequate foundation, lay opinion testimony regarding

Kaplan's knowledge of the fraud and testimony regarding others' knowledge of the fraud." *Id*. at 114.  The government's evidence failed to show that the lay opinion testimony of a witness (Attorney Galkovich) "as to Kaplan's knowledge was rationally based on facts he had observed." *Id*. at 119.

In addition to the district court's error in admitting the lay opinion testimony, the Second Circuit stated:

> We conclude, furthermore, that this limited probative value is substantially outweighed by the risk of unfair prejudice. Although relevant evidence is always prejudicial to one side, we conclude that the risk of *unfair* prejudice here -- in particular, the likelihood that jurors would render a decision on an improper basis by giving this testimony undue weight or improperly holding Kaplan liable because they believed he should have known of the fraud -- was great. The jury was required to draw a series of inferences, unsupported by other evidence, to connect Galkovich's testimony about his guilty knowledge (and that of others) to Kaplan's own knowledge, the ultimate issue in the case. Under the circumstances, the District Court should have concluded that whatever slight probative value the testimony might have had was outweighed by the risk that the jury would draw improper inferences from the testimony.

*Id.* at 122.  Furthermore, "[t]he length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more susceptible to exclusion as unduly confusing, prejudicial, or time-consuming." *Id*. (quoting *United States v. Ravich*, 421 F.2d 1196, 1204 n. 10 (2d Cir. 1970)).

19

"[C]harges of conspiracy are not to be made out by piling inference upon inference." *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) (internal citations omitted).  It is "clear that the government has a heavy burden when it seeks to prove conspiracy by inference." *United States v. Pedigo*, 12 F.3d 618, 625 (7th Cir. 1993).  Multiple improper inferences are needed to support the Government's theory.  For example, others' knowledge cannot support an inference of a particular defendant's knowledge.  *See United States v. Kessi*, 868 F.2d 1097, 1104 (9th Cir. 1989) ("intent to defraud cannot be based on constructive knowledge of facts known to others with whom one is involved").

Similarly, the Second Circuit in *Kaplan* stated that "the likelihood of prejudice was increased by the government's improper use of the evidence of others' knowledge.  In summation, the prosecutor argued, '[Kaplan] had to know. Everybody else did.'  As noted, the evidence did not support any such inference." *Kaplan*, 490 F.3d at 122.  Here, the Government's own witnesses did not have personal knowledge of any alleged fraud in order for the Government to then attempt to use their knowledge to improperly impute it to Defendants.  The Government seeks to pile improper inference upon improper inference, and such inference stacking is reversible error conspiracy case. *Direct Sales*, 319 U.S. at 711.

20

The use of others' knowledge rejected by the Second Circuit in its decision

in *Kaplan* is reinforced by a decision this year by the First Circuit in the highly

publicized Varsity Blues scandal.  In *United States v. Abdelaziz*, 68 F.4th 1 (1st

Cir. 2023), the First Circuit vacated the conspiracy to commit mail fraud and wire

fraud convictions of the two parents who were accused of using the services of

Rick Singer to pay universities to admit their children as athletic recruits.  At trial

the government informed the jury that "One thing that you need to find is that the

defendants knew that what they were doing was wrong. One way you know that

they did is because Bruce Isackson told you that he knew it, from the witness

stand."  *Id.* at 21 (internal brackets and ellipses omitted).  The First Circuit found

this error required a new trial, stating that "the government introduced powerful

evidence of culpable intent on the part of other parents that presented a pervasive

risk of prejudicing the jury's assessment of each defendant's own intent."  *Id.* at

55.[5]  The same mistake should not occur in this case.

Moreover, the Supreme Court has repeatedly rejected attempts to infer the

mental state of a criminal defendant based on a negligence standard, including

doing so last year.  *See Ruan v United States*, 597 U.S. ___, ___, 142 S. Ct. 2370,

2381 (2022).  In *Ruan*, the Supreme Court stated that "the Government's standard

---

[5] On remand, the government filed a Notice of Dismissal pursuant to Fed. R. Crim.
P. 48(a).  *United States v. Abdelaziz*, Case No. 1:19-cr-10080 (D. Mass. 2023),
Doc. 2683.

would turn a defendant's criminal liability on the mental state of a hypothetical 'reasonable' doctor, not on the mental state of the defendant himself or herself." *See Id*. Similarly, here, the Government appears poised to ask the jury to infer that the Defendants are criminally culpable based on a negligence standard that would evaluate the mental state of a reasonable person as opposed to the specific mental state of each defendant himself. As described by the Second Circuit in *Kaplan*, there is a "great" risk of unfair prejudice due to "the likelihood that jurors would render a decision on an improper basis by giving this testimony undue weight or improperly holding [Defendants] liable because they believed [they] should have known of the fraud." *Kaplan*, 490 F.3d at 122.

The Government should be precluded from using and arguing any of these improper inferences to show Defendants knowledge of the alleged fraud. The likelihood that jurors would render a decision on an improper basis would be greatly increased if the Government's witnesses were allowed to spoon-feed the jury a legal conclusion that the crash reports were obtained by means of fraud and that the Defendants knew the crash reports were obtained by means of fraud. Any probative value is substantially outweighed by the risk that the jury would draw improper inferences from the testimony, especially since none of the witnesses had actual knowledge of the nature of the fraud as pled in the Indictment. Thus, any

purported knowledge of "fraud" is simply irrelevant to the instant case and must be excluded.

## CONCLUSION

The lay opinion testimony of the Government's witnesses fails to satisfy the requirements of Fed. R. Evid. 602 and 701 as it is not rationally based on the witness's perception, and it is also not helpful.  Even if, for the sake of argument, the lay testimony of the Government's witnesses met the requirements of Rules 602 and 701, any probative value would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and/or misleading the jury, and should be excluded pursuant to Fed. R. Evid. 403.   Furthermore, the government should be precluded from arguing the knowledge of others is proof of the defendants' knowledge at trial.

Respectfully submitted,

/s/ Abed Hammoud
Abed Hammoud (P54908)
*Counsel for John Angelo*
645 Griswold, Ste. 1717
Detroit, MI 48226
(313) 303-0427
abed@abedhammoudlaw.com

/s/ John Minock
John Minock  (P24626)
*Counsel for Thomas Quartz*
339 E. Liberty, Suite 200
Ann Arbor, MI  48104
734-668-2200
jminock@cramerminock.com

Dated:  October 9, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2023, I electronically filed this brief using the ECF system which will send notification of the filing to all counsel of record included in the ECF system.

Respectfully submitted,

/s/ Abed Hammoud
Abed Hammoud (P54908)
Abed Hammoud Law, PLLC
645 Griswold St, Suite 1717
Detroit, MI 48226
(313) 303-0427
abed@abedhammoudlaw.com
*Attorney for John Angelo*